**IN THE COURT OF APPEALS OF IOWA**

No. 17-0486
Filed June 21, 2017

**IN THE INTEREST OF J.O. and C.O.,**
**Minor Children,**

**M.S., Mother,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Linn County, Susan F. Flaherty, Associate Juvenile Judge.

　　A mother appeals the termination of her parental rights to two sons. **AFFIRMED.**

　　Ellen R. Ramsey-Kacena, Cedar Rapids, for appellant mother.

　　Thomas J. Miller, Attorney General, and Gretchen W. Kraemer, Special Assistant Attorney General, for appellee State.

　　Judith J. Hoover of Hoover Law Office, P.C., Cedar Rapids, guardian ad litem for minor children.

　　Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

A mother, Melissa, appeals the termination of her parental rights to two sons, J.O. and C.O., now ages four and two. Melissa argues her progress toward reunification was "stymied" because the juvenile court declined to give the Iowa Department of Human Services (DHS) discretion to allow anything but supervised visitation from May 2015 until October 2016. Melissa also contends: "The length of time between the termination trial in September 2015 and the ruling in March 2017 does not support a finding of clear and convincing evidence. If the evidence were truly clear and convincing, a ruling would have been forthcoming in less than eighteen months."

We agree the inordinate delay between the original hearing on the State's termination petition and the juvenile court's ruling terminating parental rights propelled Melissa into a parental purgatory not contemplated by Iowa Code chapter 232. After a termination hearing is concluded, the juvenile court must file written findings—either dismissing the petition or ordering parental rights terminated. Iowa Code § 232.117(1)–(3) (2017). While the statute does not include a deadline for issuing a termination decision, our case law stresses the importance of a timely determination of children's permanent placement. *See In re P.L.*, 778 N.W.2d 33, 36 (Iowa 2010).

In its termination order, the juvenile court offered no explanation for letting the case languish. Instead, the court tried to spin the delay as a bonus for the parents, asserting it provided them "with additional time to demonstrate the ability to care for their children." We reject this assertion. Given the strong public policy against protracted litigation in dependency proceedings, we cannot endorse a de

facto continuation of permanency where the juvenile court offers no rationale for postponing its decision. *See* Iowa Code § 232.104(2)(b) (requiring enumeration of "specific factors, conditions, or expected behavioral changes" providing a basis for determination the need for removal of children from home will no longer exist at the end of six-month period).

All that being said, after independently reviewing the record,[1] we cannot find the court's delay requires reversal based on the issues raised in Melissa's petition on appeal. Accordingly, we affirm for the reasons that follow.

## I. Facts and Prior Proceedings

J.O. tested positive for cocaine at his birth in 2013. Melissa, who had a long history of addiction, acknowledged using crack cocaine throughout her pregnancy. J.O.'s father, Jason, also had a history of substance abuse, and Jason engaged in domestic violence against Melissa. The DHS initiated a child-in-need-of-assistance (CINA) action, but because Melissa immediately arranged to enter a residential substance-abuse treatment program for women with children, the DHS did not seek to remove J.O. from his mother's care.

On April 17, 2013, the juvenile court adjudicated J.O. as a CINA, and J.O. remained with Melissa. In accordance with the adjudication order, Melissa participated in substance-abuse and mental-health treatment. But Jason did not consistently engage in services. On June 4, 2013, the court ordered Jason to

---

[1] We review child-welfare proceedings de novo. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). We are not bound by the factual findings of the juvenile court, but we do give them weight. *See id.* "The [S]tate has the burden to prove the allegations of the petition by clear and convincing evidence." *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995). Evidence is "clear and convincing" when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *M.W.*, 876 N.W.2d at 219 (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

have only supervised contact with J.O., and Melissa was not to "supervise or facilitate contact" between Jason and J.O.

In February 2014, J.O. received a bad burn on his abdomen. Melissa was unsure how the injury occurred. A DHS social worker completed a protective assessment and concluded the abuse report should be founded, identifying Melissa as failing to provide critical care or proper supervision, though the social worker did not believe Melissa inflicted the injury on J.O. The DHS developed a safety plan with Melissa and concluded J.O. could safely remain in her care.

Two months later, J.O. received another burn injury, this time to two areas on his back. Melissa reported the marks to her family safety, risk, and permanency (FSRP) provider, explaining it was a "carpet burn" caused by Melissa's older son, A.S.,[2] pulling J.O. by his legs in the play area at the mall. A doctor at the Child Protection Center, who examined J.O., was skeptical of Melissa's explanation given the softness of the play-area surface and the lack of injury to J.O.'s spine. The doctor also noticed a bruise on the back of J.O.'s ear consistent with pinching or pulling. The same social worker completed another child-abuse assessment based on the second incident, which again resulted in a founded report of child abuse for failure to provide adequate supervision. On April 22, 2014, at the DHS's request, the juvenile court ordered J.O. to be placed in foster care. The court also ordered J.O. to be tested for illegal substances; the results were positive for cocaine.

---

[2] A.S. lives with Melissa's ex-husband, Chris, and Melissa exercises weekend visitation. A.S. was not a subject of the termination proceedings.

In the spring and early summer of 2014, Melissa lost headway in her efforts to reunify with J.O. She relapsed on drugs and missed visits with her son. She resumed her relationship with Jason and became pregnant with C.O. During the month of J.O.'s removal, Melissa was arrested for driving while barred. And on June 21, 2014, Jason was arrested for domestic-abuse assault causing injury after Melissa, who had abrasions on her neck, reported to police the couple's argument had become physical.

Melissa re-entered residential substance-abuse treatment on August 11, 2014. She was discharged successfully from the facility and began working with aftercare services. The DHS agreed to increase the duration of Melissa's visitation to three hours a session, while the court found Jason would need to meet with a service provider before reinstating his fully supervised visitation.

C.O. was born in December 2014. Although Melissa admitted using cocaine during her pregnancy, C.O.'s drug screen was negative at birth. The DHS immediately requested C.O.'s removal based on Melissa's history of substance abuse and founded child-abuse reports, as well as her lack of stable housing and employment. The juvenile court adjudicated C.O. a CINA.

One month after C.O.'s removal, on January 12, 2015, the State filed a petition to terminate Melissa and Jason's parental rights to J.O. The following week, Melissa transitioned to semi-supervised visitation with the children. But less than a month later, J.O. returned from a visit with unexplained scratches on his neck. This prompted the DHS to establish a protocol with Melissa and daycare staff to complete an inspection of the children whenever Melissa picked them up or returned them from visitation.

In the next few months, Melissa started a job at Hy-Vee and secured an apartment through a transitional housing program. She also progressed to unsupervised visitation with her sons. Melissa told service providers she did not spend time with Jason, but providers occasionally saw them together. In reports filed in February and May 2015, the guardian ad litem (GAL) leveled concerns about Melissa's ongoing relationship with Jason because he had not been complying with services recommended by the DHS.

At a review hearing in May 2015, the DHS recommended a trial home placement of the children with Melissa to take place in the next sixty days. The court was wary of the timeline, noting Melissa's "efforts appear superficial in terms of making the changes in her lifestyle and adult relationships necessary to maintain a safe environment for the child." Despite its concerns, the court granted the DHS discretion to move forward with overnight visitation.

On May 20, 2015, Melissa returned C.O., who was then five months old, to daycare after an unsupervised visit. After Melissa left, daycare staff noticed four small, faint bruises on C.O.'s torso and temple. The DHS initiated a child-abuse assessment. Melissa denied knowing the source of the bruising but told workers the injuries could have occurred during play with J.O. and her adult daughter. A doctor at the Child Protection Center who examined photographs of the injuries found them to be concerning due to C.O.'s age and limited mobility. A DHS social worker characterized the bruising as "minor" but was concerned at Melissa's lack of explanation for the injuries. The DHS concluded the report of child abuse was founded, naming Melissa as the perpetrator responsible for

denying critical care and proper supervision. Melissa reverted to fully supervised visits.

Over the summer of 2015, Melissa's prospects for reunification faltered in some ways and progressed in others. Melissa continued her contact with Jason, and he again assaulted her at her home. She was unemployed. But she successfully completed her substance-abuse treatment at the end of June 2015. She also consistently participated in mental-health treatment and visitation with her children. At a hearing on July 14, 2015, the court ordered visitation to continue to be fully supervised and "rescind[ed] prior authorization to the [DHS] to reduce the level of supervision of visitation" due to the May 2015 founded child-abuse report and the history of injuries to the children.

The State filed a petition to terminate Melissa and Jason's parental rights to C.O. on August 11, 2015. About one month later, on September 14 and 15, a joint permanency-review and termination hearing—regarding both C.O. and J.O.—took place. At the time of the hearing, Melissa was participating in fully supervised visitation four times a week and had maintained her sobriety for approximately one year. But she was unemployed and facing the potential loss of her housing due to her lack of employment and her housing provider's suspicions that Jason had been living at her apartment.

DHS workers acknowledged Melissa's progress with services and consistency with visitation but still recommended termination of her parental rights, citing concerns about Melissa's continuing relationship with Jason, particularly Melissa's lack of truthfulness about the relationship, as well as

worries related to Melissa's lack of explanation for injuries to her children. One social worker explained:

> I have the opinion that when we are there and we are supervising visits that Melissa is definitely engaged and is doing a good job of parenting the children. My concerns become after those visits end and the choices that she makes during the time when the children are not [present].

Melissa's FSRP provider indicated Jason would "show[] up randomly during visits" at Melissa's apartment, which she found concerning because of Jason's lack of participation in services and drug testing. But she also indicated Melissa had been parenting appropriately during visits and shared a "very strong bond" with her children.

Five months passed. On February 17, 2016, Melissa requested that the court re-open the record to permit the inclusion of an amended finding from the DHS's original child-abuse assessment.[3] The court granted Melissa's request and received the evidence, noting the matter was then "resubmitted for ruling."

Melissa also filed an application for reasonable efforts, requesting the court allow her to progress to semi-supervised visitation. On April 13, 2016, the court held a hearing on Melissa's request. Following the hearing, the court concluded:

> Although there clearly continues to be issues regarding mother's decision-making and safe[t]y of her home/associates, those issues can be safely managed with semi-supervised visitation . . . . The *motion is therefore granted*, and the [DHS] may reduce the level of supervision of mother's visitation to semi-supervised so long as frequency and duration of all visitation is not increased.

---

[3] The DHS had agreed to amend its original abuse assessment finding of denial of critical care from "confirmed and placed" to "confirmed, not placed."

Three more months passed. On July 15, 2016, the State filed a request for a written order from the September 2015 hearing. The assistant county attorney noted a DHS social worker informed him that "since no reasonable efforts findings have been made by the Court since July of 2015, the State of Iowa may no longer be eligible to receive federal IV-E funding reimbursements to offset the costs of the children's placements." Without further hearing, the juvenile court entered a permanency review order that same day. The court referenced progress reports submitted by the DHS dated September 4, 2015— some ten months earlier. The court then found "reasonable efforts to achieve the child(ren)'s permanency plan have been made," indicated the permanency goal was "reunification with a parent with a concurrent goal of termination of parental rights and adoption," and noted its ruling on the State's termination-of-parental-rights petition remained pending.

Another month passed. On August 22, 2016, Melissa, who had continued to participate in visitation and drug screens, asked the court to re-open the record "to permit inclusion of the information that has occurred in the ten months since the end of the termination trial." She also filed an application for reasonable efforts, requesting the court grant the DHS discretion regarding visitation, so she could progress to unsupervised visitation.

In a report filed September 1, 2016, the Foster Care Review Board observed that Melissa did "very well in caring for and interacting with the children." The Board also addressed the long wait for a court ruling, stating: "The Board is gravely concerned about the amount of time that has passed without a ruling from the court as it delays permanency for these children. We would

strongly recommend that the Court enter a ruling . . . within the next six to eight weeks." On the following day, September 2, the court scheduled an additional thirty-minute hearing for October 19, 2016.

At the October 19 hearing, neither party provided additional testimony, but Melissa offered into evidence the DHS reports generated since the termination hearing. Due to Melissa's increased contact with the children and their strengthened bond, the DHS no longer recommended termination. But the DHS social worker believed the children would still be at risk of adjudicatory harm if immediately returned to Melissa. The GAL similarly expressed doubt about the propriety of termination. The State maintained its position Melissa's rights should be terminated and expressed continuing reservations about Melissa's "relationships and how she would do in parenting and supervision in an unsupervised setting and overnights." But the assistant county attorney acknowledged, if "the evidence was clear and convincing, [the court] presumably would have a ruling by now."

On November 8, 2016, the court issued an order finding the DHS had made reasonable efforts to achieve the children's permanency plan and granting the DHS "discretion regarding the frequency, duration and level of supervision of [Melissa's] visits, to include overnight visitation." On November 22, the court issued an order stating that the termination-of-parental-rights matter was again "resubmitted for ruling."

In the weeks that followed, Melissa transitioned to unsupervised visits with a plan in place to move toward overnight visits. As she had throughout the proceedings, Melissa struggled to maintain stable employment and housing.

After a few months of unemployment, Melissa secured a job at Arby's in early 2017, but she was unsuccessful in her search for new housing and planned to move to a shelter after her lease expired in February. Service providers continued to suspect Melissa was allowing Jason contact with the children and underscored to Melissa "the importance of maintaining boundaries with Jason."

Melissa appeared to cross those boundaries on January 7, 2017, when—following a trip to the mall with J.O. and C.O.—she accepted a ride from Jason, who was then arrested for driving without a valid license while the boys were in the car. The State moved to reopen the termination-of-parental-rights record to offer information about the unapproved contact. The court set the matter for a thirty-minute hearing on February 2, 2017.

At the February 2 hearing, the court received into evidence a letter from the DHS dated January 11, 2017, which described the incident. The DHS also suspected Melissa had been allowing the children to have unapproved contact with Jason before the incident, noting J.O. told a DHS social worker "that sometimes he plays with his daddy." The letter concluded:

> At this time the Department does not believe that the children could be safely maintained in their mother's care, even with services involved. It appears that Melissa will continue to repeat the same behaviors over and over. Melissa has known that Jason is not approved to be around the children and she also knows that she can't supervise contact between Jason and the children. Despite knowing this Melissa chose to have the children with Jason.

Melissa took the stand at the hearing to offer a more benign explanation for the unapproved contact with Jason. She testified she had been playing with the children at the mall and missed the bus. She called her ex-husband, Chris, to give her a ride, but he was busy and sent Jason to get them. She stated she

"made a bad choice" and "got in the vehicle with the boys with Jason knowing that he wasn't approved. It was cold. I was running behind. I had a lapse in judgment." Melissa also admitted lying to a case worker about the incident, telling her "it was Chris that got arrested, not Jason." But Melissa denied the children had had any other contact with Jason, attributing J.O.'s musings about his "daddy" to the child's active imagination.

The court "resubmitted" the case for the third time and, on March 13, 2017, issued an order terminating Melissa's parental rights under Iowa Code section 232.116(1)(h) and Jason's parental rights under subsections (e) and (h).[4] The court did not explain its reason for waiting eighteen months before issuing a ruling but asserted the "[d]elays . . . provided Melissa and Jason with additional time to demonstrate ability to care for their children" and noted the record had been updated after the original hearing "to allow the court to assess the progress made by either parent." The court concluded:

> Melissa's unhealthy, unsafe adult relationships, history of drug use combined with her continuing association with drug users, her difficulties in maintaining stable housing and employment, and lack of good decision making, results in Melissa being unable to provide a safe, stable home for her children on a permanent, long term basis.

Melissa appeals the juvenile court's termination order.

**II. Analysis**

**A. Reasonable Efforts**

Melissa first argues she was "denied an opportunity to reunify" with her children because the juvenile court "refus[ed] to grant DHS discretion for

---

[4] Jason is not a party to this appeal.

anything but fully supervised visits with a provider from May 2015 until October 2016," "stagnating the mother's visits at fully supervised, while there were no safety concerns that justified fully supervised visits." The State counters that Melissa's own "pattern of relationships with problematic individuals, poor judgment, and dishonesty" prevented her from moving forward with visitation.

Under Iowa Code section 232.102(7), the DHS must "make every reasonable effort" to return the children home "as quickly as possible consistent with the best interests of the child[ren]." While the duty to make reasonable efforts is not "a strict substantive requirement of termination," the extent of the efforts made by the DHS "impacts the burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). In considering reasonableness of the nature and extent of visitation offered by the DHS, the best interests of the children are controlling. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996).

Here, the juvenile court issued an order in July 2015 prohibiting the DHS from increasing visitation or reducing supervision at visits following a founded report of child abuse against Melissa. At her request, the court allowed Melissa to progress to semi-supervised visitation in April 2016. In response to Melissa's next request, in October 2016 the court approved her to transition to unsupervised visits and eventually a trial home placement. But before a trial home placement had taken place, Melissa allowed unsupervised contact between Jason and the children and put them in the position of watching their father's arrest for driving under suspension.

Given the history of unexplained injuries to J.O. and C.O., we decline to find a denial of reasonable efforts based on the juvenile court's assessment that it was in the children's best interests to require fully supervised visitation in July 2015. Further, Melissa is not on solid footing when arguing that she should have been approved for unsupervised visitation sooner, given that when she was afforded that level of trust, she placed the children in harm's way and then lied to service providers about her lapse in judgment. Accordingly, we find no violation of the reasonable-efforts requirement.

## B. Statutory Ground

Next, Melissa contends the State failed to offer sufficient proof of the statutory ground for termination. The juvenile court terminated Melissa's parental rights under Iowa Code section 232.116(1)(h). Under that subsection, the State must prove with clear and convincing evidence: (1) the children are three years of age or younger, (2) they have been adjudicated CINA, (3) they have been out of their parents' physical custody for at least six of the last twelve months or the past six consecutive months, and (4) they cannot be returned to the custody of their parents at the present time. Iowa Code § 232.116(1)(h); *see also In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (identifying relevant time in fourth element as date of termination hearing). Melissa challenges only the State's proof of the fourth element.

We find clear and convincing evidence the children could not be returned to Melissa's custody at the time of the February 2017 termination hearing. After years of DHS involvement, significant concerns persisted about the safety of J.O. and C.O. as DHS supervision decreased. Moreover, as she did throughout much

of the case, Melissa lacked a stable home environment at the time of the termination hearing. She was planning to move into a shelter and had maintained employment for only a few weeks. For all of those reasons, we conclude J.O. and C.O. could not be safely returned to Melissa's care.

## C. Additional Time

Melissa contends she should be given additional time for reunification. She argues she was not granted the opportunity to show her ability to adequately care for the children because she could not progress with visitation following the initial termination hearing in September 2015. But the State argues, considering the delay in the juvenile court's ruling and Melissa's failure to resolve DHS concerns in that time, it would not be in the children's best interests to postpone permanency any longer.

Under Iowa Code section 232.104(2)(b), the court may continue placement for the children for an additional six months if the court determines the need for removal "will no longer exist at the end of the additional six-month period." The DHS has been involved with this family for more than four years. While Melissa has made remarkable strides in addressing her substance abuse and has shown a strong commitment to building a relationship with her sons, other aspects of her life remain unstable. Her chronic inability to maintain employment and housing or to avoid unsafe encounters with Jason will not likely be resolved even if she was given six more months. J.O. and C.O. should not have to wait any longer for permanency. *See D.W.*, 791 N.W.2d at 707 ("We do not 'gamble with the children's future' by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (citation omitted)).

### D. Best Interests

Finally, Melissa argues because of her strong bond with J.O. and C.O., termination of her parental rights was not in their best interests. *See* Iowa Code § 232.116(2), (3)(c). The State contends Melissa's "continuing chaotic relationship with [Jason]" is problematic and it is not in the children's best interests to "continue to be exposed to domestic violence and drug use."

In determining whether to affirm the termination of parental rights, we give primary consideration to the safety of the children; their physical, mental, and emotional condition and needs; and the placement that best provides for the children's long-term nurturing and growth. *See id.* § 232.116(2); *see also D.W.*, 791 N.W.2d at 708. As described above, Melissa has been unable to maintain a safe and stable environment for her children. Accordingly, the factors in section 232.116(2) support termination.

Finally, we consider whether "[t]here is clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." *See* Iowa Code § 232.116(3)(c). While we agree Melissa shares a bond with her sons, they have been removed from her care for more than two years—C.O. has never lived with Melissa, and J.O. has been removed from her care for more than half of his life. Both have developed a close relationship with their foster mother. Moreover, Melissa's failure to fully address the safety concerns that necessitated continuing DHS involvement convinces us that allowing J.O. and C.O. to move toward adoption

would be beneficial to their physical and emotional welfare.

Accordingly, we affirm.

**AFFIRMED.**